IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| SKY JET M.G. INC., <br><br> Plaintiff, <br><br> v. <br><br> VSE AVIATION SERVICES, LLC, <br><br> Defendant. | Case No. 2:23-cv-02210-HLT |

## MEMORANDUM AND ORDER

Plaintiff Sky Jet M.G. Inc. has sued Defendant VSE Aviation Services, LLC, for negligence and unjust enrichment arising out of damages sustained to an aircraft engine. The primary issue in the case is what caused the damage to the engine—a part overhauled by Defendant or something else. Plaintiff moves to exclude a causation opinion by Defendant's expert Mark Pottinger as unreliable and irrelevant. Doc. 84. The Court denies the motion because Pottinger disclosed his opinions, his opinions are reliable despite Plaintiff's criticisms of the SDRs, and his opinions are relevant to the issue in this case (i.e., what caused the damage to the engine).

### I.   BACKGROUND

This case involves damage to an aircraft engine. Defendant overhauled an engine part called a fuel control unit ("FCU"). *See* Doc. 81 at 2-3 (factual stipulations). Plaintiff later installed the FCU in the left engine of its aircraft. *Id.* A ground run and test flight following installation of the FCU were successful. *Id.* After the aircraft was returned to service, two attempts to start the engine resulted in significant spikes in the internal temperature of the engine, which caused damage. *Id.* at 3. Plaintiff has sued Defendant for negligence in its overhaul of the FCU. *Id.* at 12. A primary issue in this case is what caused the engine damage. Both parties have designated experts on this issue. One of Defendant's experts is Mark Pottinger.

Pottinger disclosed four reports. Doc. 84 at 3. His initial report, dated November 15, 2023, explained that an "engine makes power by taking ambient air and drawing it through the inlet and into the compressor section of the engine," before passing into a "single centrifugal impeller." Doc. 84-4 at 4. "From the impeller the air travels through an array of diffuser pipes evenly spaced around the inner diameter of the gas generator case," before exiting to pass "through straightening vanes mounted at the outlet ends of the diffusers" *Id.* at 5. The compressed air then enters the combustion chamber where it combines with fuel and ignites. *Id.* at 6. The FCU controls fuel flow to the engine depending on engine speed. *Id.* at 7-8 ("In short, with too much engine speed relative to the desired power setting the FCU will reduce fuel to the engine. Too little engine speed relative to the desired power setting and the FCU will increase fuel flow.").

Pottinger also explained the role of pilots during starting procedures and the need for the pilot to "be vigilant for abnormal start conditions" and to "take immediate action to manage an abnormal start" at the risk of engine damage. *Id.* at 8-10. One such abnormal start is a hot start. *Id.* at 10. "A hot start occurs when there is too much fuel or too little turbine RPM." *Id.* at 11. It can be caused by "improper pilot action, a failure of the FCU or fuel nozzles, or a weak electrical power source for the starter." *Id.* Two hot starts occurred in the subject aircraft on January 30, 2022. *Id.* at 15.

Pottinger reviewed the maintenance records for the engine. He noted that problems with the engine began a few weeks before the FCU was replaced. *Id.* at 21. A ground run after the FCU was replaced showed it "checked serviceable" and had two or three starts without any malfunction. *Id.* at 22. Pottinger opined that, if there was a problem with the FCU when it left Defendant's control, "there is no explanation why that problem did not manifest itself during the bench test at [Defendant] or during the two or three starts completed prior to the signed maintenance release on

January 29, 2022." *Id.* at 22-23. Pottinger concluded that that causes of the hot start other than the FCU had not been ruled out, including "[p]ilot error, inadequate electrical power, and problems in the starter/generator system." *Id.* at 23. Given the successful starts before the hot starts, Pottinger believed "causes other than the FCU are more likely the source of the hot starts." *Id.*

Pottinger also inspected the engine. One of the straightening vanes was broken and cracked, and it had a broken weld on the top crossbar. *Id.* at 19. It was wedged against the diffuser outlet. *Id.* The source of the damage was unknown, but "[i]ncreased sooting was observed in the area of the damaged straightening vane." *Id.* Pottinger stated: "The impact of the broken straightening vane on engine operation, or what caused the damage to the vane, have not been determined." *Id.* at 23. However, he found that whatever the cause of the hot starts, the flight crew failed to appropriately react by aborting when the internal temperature reached 900 degrees. *Id.* at 24. Both hot starts reached 1,000 degrees. *Id.*

Pottinger supplemented his report three times.[1] Relevant here, the first supplement included a similar statement as the original report that the impact of the broken straightening vane had not been determined, though it added that the sooting pattern around the damaged straightening vane "indicates a disturbance in flow in the area of the broken diffuser." *See* Doc. 84-6 at 22, 26.

The second supplement incorporated the original and first supplement but primarily focused on information from the flight data recorder. *See* Doc. 84-7 at 2-3. It concluded that the flight data recorder information showed that the flight crew was slow to react to the abnormal engine readings during the hot starts. *Id.* at 7. Regarding the broken straightening vane, it stated that "a general rule in reconstructing turbine engine failures is to trace engine damage from

---

[1] Only the last supplement is at issue. The parties don't discuss the differences in the earlier supplements, but one appears to incorporate material from an aircraft flight manual that was later obtained by Pottinger, and another incorporates information from the flight data recorder after it was produced to Pottinger. Pottinger's supplemental reports expand on the opinions discussed above, but they generally are substantively the same.

downstream to upstream in the flow path," and that the "most upstream damage signature is typically the most likely origin of the engine failure." *Id.* at 5. In this case, the "fractured and damaged diffuser straightening vane" was the most upstream damage. *See id.* This would have altered the airflow in the combustion chamber. *Id.* But Pottinger still could not "state with certainty that the broken vane caused the hot starts," though it had not been eliminated "as a contributory source of the poor starting performance observed in the left engine data and the damage evident in the engine." *Id.* at 5-6; *see also id.* at 7 ("The broken vane has not been ruled out as a contributory cause of the hot starts in the left engine.").

The last supplement, dated October 7, 2024, is at issue in the current motion. Pottinger's October 7 report states that he had previously searched the FAA's Service Difficulty Report ("SDR") system "for incidents that could be informative respecting the subject engine." Doc. 84-8 at 2. Although he had suspected that the "diffuser straightening vane" could have disrupted airflow in the engine and caused issues, he was not prepared to give that opinion "without a reference." *Id.* After issuing his initial reports, however, he found two SDRs that "dealt with damage to the diffuser system in a PT6 engine and the resultant engine anomalies." *Id.* The two SDRs he discovered showed a damaged diffuser system causing increased temperatures and fluctuating engine parameters. *Id.* at 3. Pottinger's report states that SDR 1 involved an engine running at higher temperature that was resolved only after the diffuser system was repaired. *Id.*; *see also* Doc. 84-10. SDR 2 reported a surge affecting all engine parameters, including a temperature reading of over 900 degrees while the power setting was above 70%. A broken diffuser tube was determined to be the cause. Doc. 84-8 at 3; *see also* Doc. 84-11.

Pottinger then concluded:

> In light of the SDR reports, and the previously discussed damaged diffuser vane, the undersigned is now prepared opine to a reasonable

4

> degree of professional certainty that the fluctuating engine parameters observed in the engine that compelled the operator to replace the fuel control unit (FCU); and, the poor starting performance, were caused by the broken diffuser straightening vane.

Doc. 84-8 at 3. His specific opinion was that "[t]he fluctuating engine parameters and the poor starting performance of the subject engine resulted from the damaged diffuser straightening vane." *Id.* at 4. This opinion was based on the SDRs, the damage to the diffuser straightening vane, and a maintenance entry from January 29, 2022. *Id.* Pottinger's previous opinion about the pilot's reaction to the hot start was unchanged. *Id.* at 3.

Plaintiff moves to exclude Pottinger's opinion in his October 7 report that "a broken engine component called a 'straightening vane' caused 'poor starting performance' or 'abnormal engine operation.'" Doc. 84 at 1. Plaintiff does not seek to exclude any other opinions. *Id.*

## II.  STANDARD

Federal Rule of Evidence 702 governs expert testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. Rule 702 imposes upon the district court a "gatekeeping role" to ensure that expert testimony is both relevant and reliable. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993); *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999).

5

In performing this gatekeeping function, "the district court generally must first determine whether the expert is qualified 'by knowledge, skill, experience, training, or education' to render an opinion." *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (quoting Fed. R. Evid. 702). Second, if the expert is qualified, the court next determines if the expert's opinion is reliable under *Daubert*. *Id.* The burden is on the party offering the expert testimony to prove its admissibility. *Id.*

There is no argument that Pottinger is unqualified. The Court therefore focuses its analysis on whether his opinions are reliable.

### III. ANALYSIS[2]

#### A. Undisclosed Opinions

Plaintiff's first argument is that Pottinger should not be permitted to give any undisclosed opinion "that the broken diffuser vane caused the hot start." Doc. 84 at 8-9. Defendant clarifies that "Pottinger did not opine that a 'broken diffuser vane caused the hot starts' and he will not offer that testimony at trial." Doc. 88 at 11.

Although this would seem to settle the issue, Plaintiff, in the reply brief, accuses Defendant of "playing semantic games in its brief." Doc. 89 at 3. Plaintiff argues that Pottinger uses "diffuser vane," "straightening vane," and "diffuser straightening vane" interchangeably, underscoring that they are all the same thing. *Id.* at 3-4. But it claims Defendant is drawing an unstated distinction between "diffuser vane" and "straightening vane" in conceding that Pottinger will not give an opinion that the broken diffuser vane caused the hot starts. *Id.* at 4. The Court notes that Plaintiff's motion also seems to draw a distinction between "diffuser vane" and "straightening vane" and uses

---

[2] Neither party has requested a *Daubert* hearing, and so the Court proceeds on the written record.

different labels at different times. *See* Doc. 84 at 8-9.[3] But as with Defendant, the distinction is not clear.

The arguments on this point are confusing and difficult to follow. Pottinger's October 7 report clearly gives an opinion about a "damaged diffuser straightening vane," so it is not entirely clear what opinion Plaintiff believes was not disclosed.[4]

For now, the Court denies Plaintiff's motion without prejudice. At the end of the day, Pottinger's opinions are in writing. And the Court agrees any opinions he gives at trial must be stated in his report. Beyond that, the Court is disinclined to rule that any specific opinion was or was not disclosed on the very unclear record currently before it. To the extent this matter needs to be addressed at trial, Plaintiff may raise it then.

**B.     Reliability**

Plaintiff next argues that Pottinger's October 7 opinion is unreliable because it is based on the SDRs, and "there is simply too great an analytical gap between Pottinger's SDRs and any conclusion that the broken straightening vane caused hot starts." Doc. 84 at 10. In acting as gatekeeper, a court must consider the expert's reasoning and methodology and determine whether it is scientifically valid and applicable to the facts of the case. *Goebel v. Denver & Rio Grande W. R. Co.*, 346 F.3d 987, 991 (10th Cir. 2003). "The reliability inquiry asks whether the methodology employed by an expert is valid—that is, whether it is based on sufficient data, sound methods, and

---

[3]  Diffuser vanes are also referred to as diffuser tubes. The Court has generally tried to follow the usage by the parties or Pottinger in the context of a particular argument, but it does not intend to draw any distinctions.

[4]  It is possible, but not clear, that Plaintiff is drawing a distinction between an opinion about a broken diffuser/straightening vane causing a hot start versus it causing fluctuating engine parameters and poor starting performance. But if this is the argument, it is not developed or clearly made. Nor is the Court prepared to find at this stage that either opinion is irrelevant to the ultimate issue in this case, which is what caused the engine damage. This is especially true when considering Pottinger's opinions in total, as he seems to be opining that engine problems caused in part by the diffuser tube/straightening vane system were exacerbated by the crew's failure to respond appropriately, leading to the hot start and ultimate engine damage.

7

the facts of the case." *Roe v. FCA US LLC*, 42 F.4th 1175, 1181 (10th Cir. 2022). The focus of the analysis is not on the conclusions reached. *Id.* Questions going to the bases and sources of an expert's opinion generally go to the weight of the opinions, rather than the admissibility. *Schneider v. CitiMortgage, Inc.*, 2019 WL 3803865, at *1 (D. Kan. 2019). However, "when the conclusion simply does not follow from the data, a district court is free to determine that an impermissible analytical gap exists between premises and conclusion." *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1233 (10th Cir. 2005). In other words, where nothing connects the conclusion to the underlying data but the ipse dixit of the expert, the "court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Plaintiff does not dispute that reliance on SDRs in general is improper. Rather, Plaintiff argues that the situations in the SDRs are so dissimilar to this case as to create an impermissible analytical gap in Pottinger's opinion. Doc. 84 at 10. This argument is based primarily on the Supreme Court's decision in *Joiner*. *See id.* In *Joiner*, the plaintiff alleged that exposure to PCBs and other substances promoted the development of lung cancer. 522 U.S. at 139. The plaintiff's expert purported to show a link between PCBs and lung cancer through citation to animal studies. *Id.* at 143. But the lower court, and later the Supreme Court, agreed that the animal studies did not support the expert's conclusions. *Id.* at 144. This was because the studies involved infant mice who had developed alveologenic adenomas after being injected directly with massive doses of PCBs. *Id.* The plaintiff, an adult human, was exposed to a much lower concentration of PCBs and had developed small cell carcinoma. *Id.* There were no links between cancer and PCBs in adult mice or in any other species. *Id.* The Supreme Court concluded: "The studies were so dissimilar

8

to the facts presented in this litigation that it was not an abuse of discretion for the District Court to have rejected the experts' reliance on them." *Id.* at 144-45.

Defendant argues that the situation here is not akin to that in *Joiner* because in *Joiner* the animal studies were the only support for the expert's position. Doc. 88 at 12. Here, by contrast, Pottinger "carried out an extensive investigation," including inspecting the engine and maintenance records. *Id.* at 13. His findings were that the engine was having issues unrelated to the FCU. *Id.* His examination of the engine found damage to the diffuser straightening vane and he proffered that the general rule is that the most "upstream" damage is usually a starting point for determining what went wrong. *Id.* He was able to rule out all potential causes except the broken diffuser straightening vane and pilot error. *Id.* So although Pottinger ultimately relied on the SDRs, they were not the exclusive basis of his opinions. *Id.* at 14. Pottinger also testified as to the distinctions between the SDRs and this case and explained why they were still persuasive. *Id.*

The Court has reviewed Pottinger's reports and both SDRs. *See Goebel*, 346 F.3d at 993 (explaining that a court may review underlying studies where a party claims they do not support an expert's conclusion). The Court agrees there are distinctions that can be drawn between the SDRs and this case. But the analytical gap is not as wide as it was in *Joiner*, nor is it so great that it renders Pottinger's opinions unreliable. This is especially true when considering the entirety of Pottinger's opinions, which are not just based on the SDRs but also on his experience, the examination of the engine, and the maintenance history of the engine.

Plaintiff identifies three ways in which the SDRs are not on point. First, the SDRs involved loose or broken diffuser tubes, while the engine in the aircraft had a broken straightening vane. Doc. 84 at 10. Therefore, Plaintiff contends the SDRs don't support the conclusion that a single broken straightening vane could impact an engine. *Id.* The Court is not convinced. As discussed

9

above, there seems to be significant confusion about the terminology and how the parts relate to each other. Plaintiff's own reply brief cites excerpts from Pottinger's testimony indicating that he believes diffuser tubes and straightening vanes operate as part of a single system, Doc. 89 at 3-4, which would suggest Pottinger would not draw as big a distinction between this case and the SDRs. Pottinger has also explained how the two parts work together to funnel air into the engine and that it is the disruption of air flow that he believes negatively impacted the engine. *See* Doc. 84-7 at 5. Given all this, the fact that the SDRs reference diffuser tubes does not automatically make them irrelevant to this case or render Pottinger's opinion unreliable. To the extent Plaintiff believes there are distinctions to be drawn between this case and the SDRs, that is more appropriately handled on cross examination.

Plaintiff's second and third arguments are that neither SDR involved a hot start or engine damage. Doc. 84 at 11. But the fact that the engine in this case was damaged by a hot start does not mean that the SDRs are meaningless because they did not involve hot starts. The SDRs both involve abnormal engine performance. Pottinger's opinion, when read as a whole, is that the engine was experiencing issues before and after the FCU was installed, and that the crew failed to properly react to abnormal engine performance, which led to the hot start that irrevocably damaged the engine. Under these circumstances, the reliance on the SDRs where such irrevocable damage did not ultimately occur does not present so great an analytical leap, especially when considering Pottinger's opinions about lack of an appropriate response by the crew.

Given this, the Court finds Defendant has satisfied its burden at this stage of showing that Pottinger's opinions are reliable.

### C. Relevance

Plaintiff's third argument is that Pottinger's October 7 report "is not directly relevant to [Plaintiff's] claim that the FCU caused the hot starts." *Id.* at 12. "Rule 702(a) of the Federal Rules of Evidence imposes a duty on the district court to ensure that the proposed expert testimony is not only reliable, but <u>relevant</u>." *Doe v. Bd. of Cnty. Comm'rs of Payne Cnty., Okla.*, 613 F. App'x 743, 745 (10th Cir. 2015). Relevance asks whether evidence makes a fact of consequence more or less probable, and in the context of expert testimony, it is often described as having a "fit" for the case regardless of its scientific validity. *Id.* at 745-46; *see also Hoffman v. Ford Motor Co.*, 493 F. App'x 962, 975 (10th Cir. 2012) ("An expert's testimony must also be relevant—it must assist the fact-finder in understanding the evidence or determining a fact in issue.").

As an initial matter, Plaintiff argues in its reply that Defendant ignores this argument in its response and therefore Plaintiff's motion should be granted as unchallenged. Doc. 89 at 2, 10. But Defendant's response addresses reliability and relevance together. Doc. 88 at 11. There is also overlap in the reliability and relevance arguments.

Plaintiff contends that the real issue is whether the FCU caused the hot starts and argues that Pottinger's opinions about the diffuser/straightening vane are not relevant to this question. Doc. 84 at 12. But Plaintiff frames the issue too narrowly. While it is Plaintiff's theory that the FCU caused the hot start, the actual issue in the case is what caused the damage to the engine. Although Plaintiff believes it was the FCU, Defendant has other ideas, including Pottinger's opinion that other engine defects were involved and that the damage was ultimately caused by the failure of the crew to appropriately react. *See Bitler*, 400 F.3d at 1238 ("This argument confuses a *Daubert* inquiry into relevant 'fit' with the jury question of which theory, plaintiffs' or defendant's, best captures the truth of the matter at issue."). Plaintiff's position that "Pottinger offers no opinion

11

linking his vague assertion of poor starting performance to the hot start," Doc. 84 at 13,[5] also ignores Pottinger's opinion about the crew's failure to appropriately react.

In sum, the Court finds that Pottinger's opinions sufficiently fit the facts of the case.

### IV. CONCLUSION

THE COURT THEREFORE ORDERS that Plaintiff's Motion to Exclude Certain Expert Testimony of Mark Pottinger (Doc. 84) is DENIED WITHOUT PREJUDICE.[6]

IT IS SO ORDERED.

Dated: June 13, 2025                    /s/ *Holly L. Teeter*
                                        HOLLY L. TEETER
                                        UNITED STATES DISTRICT JUDGE

---

[5] The Court again notes that Plaintiff may be attempting to draw some distinction between poor starting performance and a hot start. But that argument is not developed. Nor is it persuasive when considering Pottinger's opinions as a whole.

[6] The motion is denied without prejudice to the extent additional *Daubert* challenges can be made on a clearer record, not to rehash issues already decided.